[No. A127888. First Dist., Div. One. June 29, 2011.]

ARLYNE THORSTROM, Plaintiff and Appellant, v.
ALAN THORSTROM et al., Defendants and Respondents;
WAYNE THORSTROM, Intervener and Appellant.

---

**COUNSEL**

Law Offices of Mark Basil Pappas, Mark Basil Pappas; Law Offices of Marianne F. Skipper and Marianne F. Skipper for Plaintiff and Appellant and for Intervener and Appellant.

Jone Lemos for Defendants and Respondents.

---

**OPINION**

**DONDERO, J.**—Plaintiff and intervener appeal from a judgment that granted defendants an implied easement for exclusive use of water from a well on plaintiff and intervener's property. We agree with the trial court that an implied easement exists under these facts, but further conclude that the scope of the easement granted to defendants is excessive, and reverse the judgment.

## STATEMENT OF FACTS

Intervener Wayne Thorstrom and defendant Alan Thorstrom are brothers. This dispute between them is focused on the right to use water from a well constructed on property owned by their mother Evelyn Sallinen,[1] and which upon her death passed to Wayne according to trust and estate instruments.

---

[1] For the sake of clarity and convenience we will refer to Wayne and Alan Thorstrom, and their wives, Arlyne and Linda, respectively, by their first names. We will also refer to Evelyn Sallinen and her husband Walter Sallinen by their first names. We will refer to Wayne and Arlyne Thorstrom collectively as plaintiffs, and Alan and Linda Thorstrom collectively as defendants. We will refer to the other witnesses in the case by their last names.

The property owned by Evelyn before her death in February of 2003 was divided into two legal parcels situated in Fort Bragg, California: a larger parcel of 7.2 acres at 29601 Sherwood Road, on which was located the family home, and a smaller parcel of 1.37 acres at 29575 Sherwood Road, where Evelyn built a home in 1968, which she occupied with her husband Walter until her death.[2] Wayne and his wife Arlyne have occupied the family home on the larger parcel (plaintiffs' parcel) continuously beginning in 1969. Alan moved away from the property and bought a house in Fort Bragg following his discharge from the Army in 1967. He thereafter visited his mother regularly but not frequently. After Evelyn died in 2003 Alan and his wife Linda occupied the home on the smaller parcel (defendants' parcel).

Three wells were located on Evelyn's property. A very "old hand-dug well" about 12 to 15 feet deep and a pump house on plaintiffs' parcel provided good water, but would often "go dry."[3] A well drilled on defendants' parcel in 1969 (the 1969 well) supplied Evelyn's water uses, which were exceedingly modest. Wayne and Arlyne were sometimes forced to use Evelyn's 1969 well for their source of water when their old well was dry. According to Wayne, he inspected the 1969 well pump regularly; it continued to function properly to provide Evelyn with water until her death.

In 1980, Evelyn paid for a larger well and pump placed on plaintiffs' parcel (the 1980 well), so they "would have water all the time." The housing for the 1980 well and "all the electronics" that controlled the well and pump remained on defendants' parcel, then occupied by Evelyn and Walter, to avoid additional costs associated with installation of entirely new equipment. A "faucet on the 1980 well" was connected by Wayne to an underground hose that ran to the old well, and from there to the plumbing for plaintiffs' house. The electrical system located at Evelyn's house was used to activate the faucet and underground line to pump water from the 1980 well to the old well. No lines or pipes connected the 1980 well to the 1969 well or to defendants' parcel. After the 1980 well was installed, Evelyn continued to use the 1969 well for her water needs. Wayne and Arlyne testified that before Evelyn's death the 1980 well was exclusively used to serve plaintiffs' parcel. Evelyn told Arlyne that both the old well and the 1980 well "belonged" to plaintiffs, and the 1969 well on defendants' parcel was "Alan's well."

On September 11, 1997, Evelyn created a revocable living trust (the Trust) into which the two parcels of property were transferred. According to the Trust provisions Wayne was granted plaintiffs' 7.2-acre parcel; Alan received defendants' 1.37-acre parcel.

---

[2] Walter died in 1994.

[3] At trial the parties referred to this as the "old well," and we will do the same.

A will executed by Evelyn on April 9, 2000 (the Will), provided for distribution of her real property in essentially the same terms as specified in the Trust. Wayne was appointed as executor of Evelyn's estate, with Alan named as successor executor.

Evelyn also signed a rather curious handwritten document entitled "Minutes Evelyn V. Sallinen Personal Trust" (Minutes), dated "Feb 21—20001 [sic]," which referred to wells Nos. 1 and 2, and stated that the "water well" located on plaintiffs' parcel "shall be used for emergency purposes in the case of drought or pump break down for the home" at 29601 Sherwood Road. In the Minutes Evelyn also devised her car to Wayne and her wedding ring to Arlyne.

Evelyn executed an amendment to the Trust on April 9, 2001, to provide that upon her death a subdivided two-acre parcel was to be deleted by the trustee from plaintiffs' 7.2-acre parcel and transferred to Arlyne's son Rick Rial.[4] The balance of the 7.2-acre parcel was to be distributed to Wayne, and if he did not survive, to Arlyne. The 1.37-acre parcel was to be distributed to Alan, and if he did not survive, to Wayne.

After Evelyn's death in February of 2003, her estate was administered through the Trust. Plaintiffs and defendants received the deeds to their respective parcels. Defendants began to occupy the house on their parcel two weeks after Evelyn's death and, pursuant to the Trust provisions, executed the required roadway and public utility easements. Arlyne testified that defendants planted various gardens, numerous trees, and a lawn on their parcel that did not exist while Evelyn was alive. To water the gardens and wash their vehicles defendants had "water going at all times."

Without plaintiffs' permission, Alan removed the faucet on the 1980 well that served plaintiffs' parcel. And over plaintiffs' objection, in 2005 defendants employed plumber David Hautala to construct a 2,500-gallon water storage tank on defendants' parcel. Defendants diverted essentially all of the water from the 1980 well to the new storage tank for use on their parcel.

Plaintiffs thereafter received only a minute and entirely inadequate quantity of "orange and really dirty" water from the 1980 well for use on their parcel. On several occasions plaintiffs attempted to have plumbers determine the reason they "weren't getting any water" from the 1980 well, but, despite a restraining order against him obtained by plaintiffs, Alan harassed and

---

[4] Rial also received a roadway and public utility easement appurtenant to the two-acre parcel. Our reference to the Trust will be to the trust provisions as amended in 2001.

threatened plaintiffs' workers until they left. Arlyne further testified that Alan harassed her through threatening telephone calls in which he swore and screamed at her, and on one occasion by blocking a road on the property.

Defendants presented expert testimony from David Hautala, the licensed plumber who drilled the 1969 well and installed the pump house and pump for it on defendants' parcel. He also constructed the 2,500-gallon water storage tank on their property in 2005. The new storage tank was designed to refill when the water level dropped by 100 to 150 gallons from the 2,500-gallon capacity. Underground pipes from the 1980 well on plaintiffs' parcel were connected to the pump house for the 1969 well on defendants' parcel. Hautala rerouted the pipes to the new storage tank. He also noticed that the "mechanical and electrical controls" for the 1980 well were located on defendants' parcel.

Based on his inspection Hautala thought the 1969 well "had been abandoned," and the "equipment was no longer operational." The rusted 40-year-old pump was inoperable, and "hadn't run for a long, long time," so he removed it. The electrical system and piping were also disconnected. Hautala temporarily replaced the pump for the 1969 well to do a flow test. He discovered that the flow rate for the 1969 well was "extremely marginal" for domestic use, although a "single person living in the house with no landscaping or yard work" might "get by" with conservation measures.

Alan testified for the defense that the 1969 well, the only one on defendants' parcel, was "abandoned." After he and his wife Linda moved into the house on their parcel following Evelyn's death in 2003, the pump for the 1969 well was "pulled" in 2004. Alan never examined the "old pump house" for the 1969 well when it was in operation, nor did he discuss the operation of any of the wells with Evelyn. He testified that the only source of water for the house on defendants' parcel while they lived there was the 1980 well on plaintiffs' parcel. The pressure tank in the pump house on defendants' parcel is connected by pipes to the 1980 well. Alan also observed that water pipes ran from the 1980 well to defendants' house.

According to Alan, he hired Hautala to construct the new water storage tank with an "ozonater installed" to aerate the water from the 1980 well to diminish the sulfur taste. Alan acknowledged that he screwed off a spigot or valve connected to a PVC pipe on the 1980 well. He did not realize that plaintiffs were taking any water from the 1980 well. Alan paid the electric bill for the 1980 well, and the pipes from that well were connected to his house, so he "didn't feel that that water was anybody else's."

Linda testified, contrary to other evidence presented at trial, that she was "friends" with Evelyn, and regularly ran errands for her. Evelyn told Linda that the source of water for defendants' parcel was the 1980 well.

Plaintiffs filed a complaint against defendants on February 10, 2005, to quiet title, for declaratory and injunctive relief, and for trespass.[5] The case proceeded to trial before the court, sitting without a jury, and was submitted for a decision in October of 2009. The trial court found that defendants have an implied "easement for the continued and unrestricted use of water from the drilled well located on the 5.2-acre parcel" owned by plaintiffs. The court restricted plaintiffs' use of water from the 1980 well to "emergency purposes" only "in time of documented drought or documented breakdown of the pump" on the old well on plaintiffs' parcel, and only upon prior reasonable notice to defendants. This appeal followed.

## DISCUSSION

Plaintiffs challenge many of the trial court's findings as unsupported by the evidence, and contest the court's conclusion based upon the findings that defendants have an implied and unfettered easement to use water from the 1980 well. In particular, plaintiffs dispute the court's reliance on the "Minutes," admitted as exhibit 10 at trial, to determine that their use of the 1980 well is limited to emergency purposes in the event of drought or failure of the old well. They also claim that defendants are "not entitled to an exclusive implied easement" to use the 1980 well, and the trial court erred by failing to "quiet title" to the 1980 well in their favor.

I. *The Lack of Any Express Easement in Favor of Defendants.*

■ Before we review the trial court's findings, we point out that defendants are relegated to obtaining some form of easement by implication rather than under the terms of conveyance articulated in Evelyn's Trust and estate documents. The fundamental law of easements provides that "an easement conveys rights in or over the land *of another*. 'An easement involves primarily the privilege of doing a certain act on, or to the detriment of, another's property. To the creation of an appurtenant easement, two tenements are necessary, a dominant one in favor of which the obligation exists, and a servient one upon which the obligation rests.' [Citations.]" (*Camp Meeker Water System, Inc. v. Public Utilities Com.* (1990) 51 Cal.3d 845, 865 [274 Cal.Rptr. 678, 799 P.2d 758] (*Camp Meeker*).) "Easements may be created by express words, by grant or reservation, usually by deed, by

---

[5] The action was filed in the name of Arlyne alone; Wayne subsequently intervened in the case.

implication (Civ. Code, § 1104) (usually involving division of land); by necessity (3 Powell on Real Property, § 410) and by prescription (open and notorious use, continuous, hostile to owner, exclusive and under claim of right). [Citation.]" (*Cushman v. Davis* (1978) 80 Cal.App.3d 731, 735 [145 Cal.Rptr. 791] (*Cushman*).)

 A rather obvious premise surfaces from the facts presented here: the 1980 well is not on defendants' property; they have no right to use of the water from it absent some form of easement granting them access to the well water that originates on plaintiffs' parcel. An equally obvious second premise follows from the first: in her Trust documents and Will Evelyn distributed the 5.2-acre parcel on which the 1980 well is located to plaintiffs without granting defendants any form of express grant or reservation of an easement to use the well water from plaintiffs' parcel. "With deeds as any other contracts, '[t]he primary object of all interpretation is to ascertain and carry out the intention of the parties. [Citations.] All the rules of interpretation must be considered and each given its proper weight, where necessary, in order to arrive at the true effect of the instrument. [Citation.]' [Citations.]" (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238 [52 Cal.Rptr.2d 82, 914 P.2d 160].) The only easement mentioned in the Trust documents is a roadway and public utility easement appurtenant granted to Rial on the two-acre parcel he was granted by Evelyn. Further, "By its terms [Civil Code] section 1113 implies a covenant against encumbrances in a grant deed 'unless restrained by express terms contained in such conveyance.' " (*Fidelity National Title Ins. Co. v. Miller* (1989) 215 Cal.App.3d 1163, 1172 [264 Cal.Rptr. 17], italics omitted.)[6] Nothing in the Trust or estate documents specifies or evinces any intent on the part of Evelyn to expressly grant defendants any form of water-use easement.

The Minutes document signed by Evelyn does not expressly grant defendants an easement to water from the 1980 well. The Minutes also fails to qualify as any form of grant deed or reservation of rights to water for the benefit of defendants' parcel. It is not notarized; it is not attested by witnesses; it does not purport to grant defendants any rights at all. Neither defendants nor their parcel is mentioned in the Minutes. At most, the Minutes is an indication of

---

[6] Civil Code section 1113 reads: "From the use of the word 'grant' in any conveyance by which an estate of inheritance or fee simple is to be passed, the following covenants, and none other, on the part of the grantor for himself and his heirs to the grantee, his heirs, and assigns, are implied, unless restrained by express terms contained in such conveyance: [¶] 1. That previous to the time of the execution of such conveyance, the grantor has not conveyed the same estate, or any right, title, or interest therein, to any person other than the grantee; [¶] 2. That such estate is at the time of the execution of such conveyance free from incumbrances done, made, or suffered by the grantor, or any person claiming under him. [¶] Such covenants may be sued upon in the same manner as if they had been expressly inserted in the conveyance."

Evelyn's intent, ambiguous as it was, but clearly it neither grants defendants the right to do any acts on plaintiffs' parcel nor entitles them to the water from the 1980 well. (See *Wolford v. Thomas* (1987) 190 Cal.App.3d 347, 354–355 [235 Cal.Rptr. 422].) Defendants cannot claim an *express* easement that grants them the right to use the 1980 well water. Their right to an easement must depend upon either creation by implication from the division of Evelyn's property, or by prescriptive use.

## II. *The Trial Court's Findings of Fact.*

We turn to an examination of the trial court findings of fact. Where, as here, the trial court's factual findings are based upon the presentation of disputed facts, we uphold the findings if supported by substantial evidence. (*Metalclad Corp. v. Ventana Environmental Organizational Partnership* (2003) 109 Cal.App.4th 1705, 1715–1716 [1 Cal.Rptr.3d 328]; *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1274 [90 Cal.Rptr.2d 41].) " 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . [.] If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion. [Citations.]' [Citation.] Substantial evidence is evidence ' "of ponderable legal significance, . . . reasonable in nature, credible, and of solid value." [Citations.]' [Citation.] It is not synonymous with any evidence." (*Saks v. Charity Mission Baptist Church* (2001) 90 Cal.App.4th 1116, 1132 [110 Cal.Rptr.2d 45].) Instead, it is " ' "substantial" proof of the essentials which the law requires . . . .' [Citations.]" (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871 [269 Cal.Rptr. 647]; *Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, 51 [248 Cal.Rptr. 217].) "In reviewing the evidence, we must resolve all conflicts in favor of the verdict, and indulge in all reasonable and legitimate inferences in order to uphold the verdict." (*Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189, 207 [48 Cal.Rptr.2d 448].)

Plaintiffs contend that the trial court's findings in the statement of decision with respect to the historic use of the 1969 and 1980 wells on the two parcels are not supported by adequate evidence. Specifically, plaintiffs claim lack of evidentiary support for the following findings: the 1969 well failed and was replaced by the 1980 well to serve defendants' parcel, then occupied by Evelyn; the water pipes from the 1980 well were connected to the house on defendants' parcel; the 1980 well was the "only source of domestic water" used by Evelyn on defendants' parcel; no pipes connected the 1980 well to

the house or the old well on plaintiffs' parcel; and the old well was the sole source of water for the house on plaintiffs' parcel. Plaintiffs also challenge the trial court's finding that the Minutes (exhibit 10) was properly authenticated as a document executed by Evelyn on February 21, 2001.

The trial court's findings cannot be reversed given our limited role as a reviewing court. Although conflicting evidence was presented, the findings that the 1980 well was connected to defendants' parcel, and the water from it was used by Evelyn before her death, were at least supported by some credible testimony. Two findings, however, lack the support of any credible evidence. Nothing in the record suggests that the 1980 well was not connected to plaintiffs' house or used by them. Nor does the evidence indicate that plaintiffs were relegated solely to use of the water from the old well for their parcel before Evelyn's death. All of the uncontradicted testimony establishes that the 1980 well was connected to plaintiffs' house by a faucet and hose apparatus—which was, in fact, later removed by Alan—and plaintiffs thereafter made full use of water from that well for their residential purposes.

■ As for the finding that the Minutes was executed by Evelyn, we agree with the trial court that proper authentication for the document was provided. "Generally speaking, documents must be authenticated in some fashion before they are admissible in evidence." (*Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 525 [67 Cal.Rptr. 761, 439 P.2d 889].) "Although writings must be authenticated before they are received into evidence or before secondary evidence of their contents may be received ([Evid. Code,] § 1401), a document is authenticated when sufficient evidence has been produced to sustain a finding that the document is what it purports to be ([Evid. Code,] § 1400). As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility." (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321 [94 Cal.Rptr.3d 198].) " 'Before a writing may be admitted in evidence, its proponent must make a preliminary showing that the writing is relevant to an issue to be decided in the action. A showing of relevancy usually means proof that the writing is authentic . . . .' (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 1997) § 24.13, p. 386.) Without such proof the writing is irrelevant because it has no 'tendency in reason' to prove or disprove a fact at issue in the case. (Evid. Code, § 210.)" (*People v. Beckley* (2010) 185 Cal.App.4th 509, 518 [110 Cal.Rptr.3d 362].) "If, however, there is sufficient evidence to sustain a finding that the writing is what the proponent claims, the authenticity of the document becomes a question of fact for the trier of fact." (*McAllister v. George* (1977) 73 Cal.App.3d 258, 262 [140 Cal.Rptr. 702].)

Several witnesses testified that the script and signature on the Minutes appeared to be in Evelyn's handwriting. While the date of *20001* was erroneously placed on the Minutes, an inference may be drawn that the document was executed in February of *2001*, particularly since Evelyn drafted other testamentary documents in that time period. Enough evidence was produced that the Minutes is a document executed by Evelyn that stated her intentions related to the disposition of specified items. (*The Luckman Partnership, Inc. v. Superior Court* (2010) 184 Cal.App.4th 30, 34–35 [108 Cal.Rptr.3d 606].) We conclude that the trial court did not abuse its discretion in admitting the Minutes as documentary evidence. (*Penny v. Wilson* (2004) 123 Cal.App.4th 596, 602–603 [20 Cal.Rptr.3d 212]; *People v. Miller* (2000) 81 Cal.App.4th 1427, 1445 [97 Cal.Rptr.2d 684]; *Interinsurance Exchange v. Velji* (1975) 44 Cal.App.3d 310, 318 [118 Cal.Rptr. 596].) The significance of the Minutes as a document, particularly to establish the rights of the parties to use of the water from the 1980 well, is quite another matter.

III. *The Trial Court's Finding That Defendants Are Entitled to an Implied Water-use Easement.*

We move to an examination of the seminal finding by the trial court that defendants have an implied "easement for the continued and unrestricted use of water" from the 1980 well, to the exclusion of any use by plaintiffs other than for "emergency purposes." Again, we accord deference to the finding of an implied easement by the trial court, which must be upheld if supported by substantial evidence. (*Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 370 [27 Cal.Rptr.2d 613, 867 P.2d 724]; *Bartholomae Corp. v. W. B. Scott Inv. Co.* (1953) 119 Cal.App.2d 41, 44 [259 P.2d 28].) If the evidence presented on the issue of an implied easement " 'is conflicting, the determination of the trial court will not be disturbed on appeal.' [Citation.]" (*Tusher v. Gabrielsen* (1998) 68 Cal.App.4th 131, 148 [80 Cal.Rptr.2d 126].)

■ An implied reservation of an easement may be inferred "where there is an obvious ongoing use that is reasonably necessary to the enjoyment of the land granted." (*Zanelli v. McGrath* (2008) 166 Cal.App.4th 615, 635 [82 Cal.Rptr.3d 835].) "Section 1104 of the Civil Code provides: 'A transfer of real property passes all easements attached thereto, and creates in favor thereof an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed.' " (*Fristoe v. Drapeau* (1950) 35 Cal.2d 5, 8 [215 P.2d 729].) ■ An "additional element usually required at common law for the creation of an easement by implication" is "that the easement should be reasonably necessary for the enjoyment of the property conveyed." (*Ibid.*; see also *Zanelli, supra,* at p. 635.)

■ Thus, an "easement will be implied when, at the time of conveyance of property, the following conditions exist: 1) the owner of property conveys or transfers a portion of that property to another; 2) the owner's prior existing use of the property was of a nature that the parties must have intended or believed that the use would continue; meaning that the existing use must either have been known to the grantor and the grantee, or have been so obviously and apparently permanent that the parties should have known of the use; and 3) the easement is reasonably necessary to the use and benefit of the quasi-dominant tenement. [Citation.] 'The purpose of the doctrine of implied easements is to give effect to the actual intent of the parties as shown by all the facts and circumstances.' [Citation.] An easement by implication will not be found absent clear evidence that it was intended by the parties." (*Tusher v. Gabrielsen, supra,* 68 Cal.App.4th 131, 141–142, fn. omitted.)

■ " 'The law does not favor the implication of easements. Such implication can only be made in connection with a conveyance, and in view of the rule that a conveyance is to be construed against the grantor, the court will imply an easement in favor of the grantee more easily than it will imply an easement in favor of a grantor. Whether an easement arises by implication on a conveyance of real estate depends on the intent of the parties, which must clearly appear in order to sustain an easement by implication. In order to determine the intent, the court will take into consideration the circumstances attending the transaction, the particular situation of the parties, and the state of the thing granted.' " (*Kytasty v. Godwin* (1980) 102 Cal.App.3d 762, 769 [162 Cal.Rptr. 556], quoting *Orr v. Kirk* (1950) 100 Cal.App.2d 678, 681 [224 P.2d 71].)

Although the evidence of an implied easement in favor of defendants is again conflicting, we find that it is at least substantial. Evelyn divided her property and transferred the smaller parcel to defendants. The only source of water located on defendants' parcel was the 1969 well, which was restricted in output and, according to Alan and the expert testimony of Hautala, in disrepair or marginally functional during Evelyn's lifetime. The water pipes and electrical system associated with the 1980 well were placed on defendants' parcel, which also suggests that defendants are entitled to at least a reasonable-use easement. The evidence indicates that Evelyn constructed the 1980 well for plaintiffs' use, and thereafter made extremely limited use of the well for her own purposes. Still, we do not think Evelyn intended to transfer defendants' parcel to them without also granting them any access to the water from the 1980 well, or to make them dependent on the limited and unreliable water from the antiquated 1969 well.

■ Finally, defendants established that the easement is reasonably necessary for the use and benefit of their quasi-dominant tenement. The requirement that the easement must be " 'reasonably necessary to the beneficial

enjoyment' of the property conveyed means no more than 'for the benefit thereof,' " and defendants were not required to prove that the easement as it existed was a strict necessity or "the only possible way" of obtaining water for their parcel. (*Rees v. Drinning* (1944) 64 Cal.App.2d 273, 278 [148 P.2d 378]; see also *Owsley v. Hamner* (1951) 36 Cal.2d 710, 719 [227 P.2d 263].) The only existing source of water located on defendants' parcel, the 1969 well, is no longer operational, so the 1980 well is vital for the supply of water to the property. (See *Trask v. Moore* (1944) 24 Cal.2d 365, 368–369 [149 P.2d 854].) Proof of the essential elements for an implied easement, while not compelling, is found in the record. Even if we would not have made the same decision had we been presented with the matter in the first instance, we cannot reverse the trial court's determination, supported as it is by the minimal standard of substantial evidence. (See *Wilens v. TD Waterhouse Group, Inc.* (2003) 120 Cal.App.4th 746, 752 [15 Cal.Rptr.3d 271]; see also *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 786 [187 Cal.Rptr. 398, 654 P.2d 168]; *ABS Institute v. City of Lancaster* (1994) 24 Cal.App.4th 285, 295–296 [29 Cal.Rptr.2d 224]; *Bartholomae Corp. v. W. B. Scott Inv. Co., supra,* 119 Cal.App.2d 41, 45.)

IV. *The Nature and Scope of the Implied Water-use Easement.*

We proceed to an inquiry into the appropriate extent of the implied easement. Plaintiffs claim that the trial court erred by granting defendants unrestricted use of water from the 1980 well, and relegating their water rights to specified emergency purposes. We agree with plaintiffs that no credible evidence in the record establishes an implied easement of the pervasive nature and scope granted to defendants by the trial court.

Well established is the rule that the "extent of a servitude is determined by the terms of the grant or the nature of the enjoyment by which it was acquired. (Civ. Code, § 806.)" (*Hahn v. Curtis* (1946) 73 Cal.App.2d 382, 390 [166 P.2d 611]; see also *Burch v. Gombos* (2000) 82 Cal.App.4th 352, 362 [98 Cal.Rptr.2d 119].) Civil Code section 1104 specifically provides that "[a] transfer of real property passes all easements attached thereto, and creates in favor thereof an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed." "Where the easement is acquired by an implied grant, the scope of the easement is measured by the extent the property was obviously and permanently used at the time when the transfer was completed (Civ. Code, § 1104). A purchaser of real property is bound to take notice of

all easements or servitudes which are 'apparent' upon inspection of the property [citations]. The extent of an easement by implied grant must be inferred from all of the circumstances of the case among which the existing and reasonably to be expected uses are considered [citations]." (*Kytasty v. Godwin, supra,* 102 Cal.App.3d 762, 771, italics omitted.)

■ Intent is the fundamental criterion for determining the extent of a servitude. (*Camp Meeker, supra,* 51 Cal.3d 845, 866–867; *Mosier v. Mead* (1955) 45 Cal.2d 629, 633 [290 P.2d 495].) Among the circumstances to be considered to determine the intended extent of an implied easement " ' "is the use which is being made of the dominant tenement at that time." ' " (*Camp Meeker, supra,* at p. 866, quoting *Fristoe v. Drapeau, supra,* 35 Cal.2d 5, 9–10.) Authorized use is measured " ' "by such uses as the parties might reasonably have expected from the future uses of the dominant tenement. What the parties might reasonably have expected is to be ascertained from the circumstances existing at the time of the conveyance. It is to be assumed that they anticipated such uses as might reasonably be required by a normal development of the dominant tenement . . . ." [Citation.] [¶] Accordingly, in determining the intent of the parties as to the extent of the grantee's rights . . . consideration must be given not only to the actual uses being made at the time of the severance, but also to such uses as the facts and circumstances show were within the reasonable contemplation of the parties at the time of the conveyance.' " (*Camp Meeker, supra,* at pp. 866–867, quoting *Fristoe, supra,* at pp. 9–10.)

■ A correlated principle is that the use of an easement, whether created by express grant, implication, or prescription, cannot be altered to impose an unreasonable or unintended burden on the servient tenement. (*Smith v. Rock Creek Water Corp.* (1949) 93 Cal.App.2d 49, 52–53 [208 P.2d 705] (*Smith*).) "Every incident of ownership not inconsistent with the easement and the enjoyment of the same is reserved to the owner of the servient estate." (*Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 702 [43 Cal.Rptr.2d 810].) "When an easement is 'non-exclusive,' the common users must accommodate each other." (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 767 [60 Cal.Rptr.2d 770].) "An easement defines and calibrates the rights of the parties affected by it. 'The owner of the dominant tenement must use his or her easements and rights in such a way as to impose as slight a burden as possible on the servient tenement.' [Citation.] ' "[T]he owner of the servient tenement may make any use of the land that does not interfere unreasonably with the easement." ' [Citation.]" (*Mehdizadeh v. Mincer* (1996) 46 Cal.App.4th 1296, 1307–1308 [54 Cal.Rptr.2d 284].)

The use of the implied easement granted by the trial court—and exercised by defendants after they occupied the dominant tenement—effectively extinguished any meaningful access by plaintiffs to water from the 1980 well. As we have observed, even if "some" evidence supports the finding that Evelyn made use of the water from the 1980 well, in an undetermined amount, during her lifetime, nothing in the record suggests that the 1980 well was drilled, constructed and used to benefit defendants' parcel alone. Nor does the evidence before us in any way imply that Evelyn intended to discontinue plaintiffs' use of water from the 1980 well in the manner ordered by the trial court. To the contrary, the undisputed testimony reveals that Evelyn intended to drill the 1980 well on plaintiffs' parcel primarily for plaintiffs' use, given the extremely meager output of the old well. Thereafter, plaintiffs continued to use water from the 1980 well for the reasonable needs associated with their household and property without diminution during Evelyn's lifetime. Evelyn's testamentary documents evince no intent on her part to terminate or decrease plaintiffs' water rights that emanated from the well on the parcel that passed to them.

The reliance placed on the Minutes by defendants and the trial court to sever plaintiffs' entitlement to water from the 1980 well is misplaced. The Minutes may have been properly authenticated as a document written and signed by Evelyn, but its legal effect, if it has any, is of no consequence in the present case. Not only does the Minutes fail to expressly grant defendants any water rights or permissible use of water, we cannot even tell which "water well" of the two located on plaintiffs' parcel and listed in the Minutes was referred to by Evelyn in the Minutes. The more reasonable interpretation of the Minutes, in light of the attendant testamentary intent, circumstances and historic use of the two wells, is that Evelyn was referring to the old well in her articulation of emergency water uses. Finally, the Minutes, even if given some recognition as a document that vaguely evinces Evelyn's intent in some form, cannot circumvent the law that only a reasonable use of an implied easement may be made, at least not without a more definitive statement from her of anticipated use of the 1980 well upon her death. Furthermore, the import of the Minutes is inconsistent with Evelyn's transfer of the property detailed in the prior 1997 Trust and 2000 Will and subsequent 2001 addendum to the Trust.

The evidence does not in any measure intimate that plaintiffs are precluded from reasonable use of water from the 1980 well located on their property. Plaintiffs are entitled to use the well on their property in any manner that is not inconsistent with the easement. (*Smith, supra,* 93 Cal.App.2d 49, 52–53.) The implied easement as granted by the trial court and currently exercised by defendants thus impermissibly interferes with plaintiffs' right to continue their reasonable use of the 1980 well. (See *Mehdizadeh v. Mincer, supra,* 46 Cal.App.4th 1296, 1307–1308; *Scruby v. Vintage Grapevine, Inc.,*

*supra*, 37 Cal.App.4th 697, 702–703.) "[T]he concern of the court in any case is not to increase the burden of the easement as it respects the servient tenement (see *Joseph v. Ager* (1895) 108 Cal. 517, 520–521 [41 P. 422]; and see *Crimmins v. Gould* (1957) 149 Cal.App.2d 383, 390–392 [308 P.2d 786])." (*Kytasty v. Godwin, supra*, 102 Cal.App.3d 762, 771.)

 We do not find, however, that defendants are restricted to the minimal historic use of the 1980 well—that is to say, the markedly austere water consumption apparently made by Evelyn during her lifetime. The scope of implied easement is not fixed and determined strictly by the manner of use in which it originated. (*Cushman, supra*, 80 Cal.App.3d 731, 735.) " 'Normal future uses [of an easement] are within the reasonable contemplation of the parties and therefore permissible, but uncontemplated, abnormal uses, which greatly increase the burden, are not.' (12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 407, p. 478.)" (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 350 [48 Cal.Rptr.3d 875].) We perceive that Evelyn, by transferring defendants' parcel to Alan upon her death, contemplated that her minimal use of the water would be increased to reflect defendants' reasonable needs after they took possession of the property. We therefore conclude that under the facts presented plaintiffs and defendants are both entitled to reasonable residential use of the water from the 1980 well. Neither party may make excessive use of the water which unnecessarily impedes the rights of the other. Yet, Alan apparently decided unilaterally, and without any supporting legal sanction, that defendants are entitled to any and all water derived from the 1980 well. He then disengaged the connection to the well on plaintiffs' property, and embarked upon an entirely unauthorized course of action designed not only to obtain as much water as he could, but also to deprive plaintiffs of any water from their own well.

Alan also directed the construction of a water storage tank on defendants' parcel that did not exist when the well was drilled or the implied easement was created upon the conveyance of the property to defendants. Evelyn's use of the 1980 well prior to the conveyance was exceedingly limited. She did not construct or operate any form of water storage facility on her property that was connected to the 1980 well. Thus, as we read the record, a water storage tank of the nature operated by defendants to serve their parcel neither existed nor was reasonably contemplated when the implied easement was created. The effect of the addition and use of the storage tank by defendants has been to siphon off essentially all of the well water for their consumption alone, often leaving only the "orange and really dirty" bottom water for plaintiffs. Arlyne offered uncontradicted testimony that as the result of defendants' diversion of water from the well plaintiffs must purchase bottled water to drink, often cannot take full showers, cook for guests or even flush

their toilets at will. Before the installation of the storage tank and the associated dramatic increase in use of the well water by defendants, plaintiffs had "plenty" of water for daily use on their parcel, as did Evelyn during her lifetime.

A reasonable increase in the domestic use of the 1980 well water by defendants may have been expected in light of Evelyn's unusually parsimonious water use as the sole previous occupant of defendants' parcel. However, the addition of a storage tank with an automatic refill feature that functioned to deprive plaintiffs of the beneficial use and enjoyment of the water from the 1980 well on their parcel was not, under the facts presented, within the reasonable contemplation of the parties when the easement was created. To find that defendants' use of the well water is unreasonable under the circumstances is an understatement.

The unwarranted use of water from the 1980 well by defendants unreasonably burdens plaintiffs' enjoyment of their property, and may be hereafter proscribed by the court. (*de la Cuesta v. Bazzi* (1941) 47 Cal.App.2d 661, 672 [118 P.2d 909].) "In holding that the easement is not an exclusive one and that a violation exists, the reviewing court may determine if an injunction will lie." (*Keeler v. Haky* (1958) 160 Cal.App.2d 471, 479 [325 P.2d 648].) The sustained overuse of the easement by defendants justifies issuance of injunctive relief to preclude further excessive and inordinate consumption of the water from the 1980 well, and to prevent a continuation of defendants' unlawful acts which would deprive plaintiffs of their full property rights. (*Keeler, supra*, at pp. 479–480; *Bartholomew v. Staheli* (1948) 86 Cal.App.2d 844, 856 [195 P.2d 824].)

## DISPOSITION

Accordingly, the judgment of the trial court is reversed. Declaratory relief is granted to plaintiffs in the nature of an order that they, as well as defendants, are entitled to reasonable residential use of water from the 1980 well. Each party is entitled to reasonable use of the well consistent with the volume of water available at any given time. Injunctive relief is also granted to plaintiffs as follows: Defendants are ordered to cease any and all use of the existing 2,500-gallon water storage tank on their property, which we find constitutes an excessive, unintended use and storage of the well water; defendants are proscribed from any unreasonable storage of water derived from the 1980 well; defendants are also prohibited from interference by any means with plaintiffs' use of their reasonable share of the well water. We do not prohibit defendants from installing or operating an aeration or filtration system to treat the well water, or from *reasonably* storing water from the well

in a manner that does not result in appropriation of plaintiffs' share of the water. The case is remanded to the trial court to issue an order for declaratory and injunctive relief consistent with the views expressed herein. Costs on appeal are awarded to plaintiffs.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied July 26, 2011.