Filed 7/7/15  P. v. Spivey CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C073902 |
| Plaintiff and Respondent, | (Super. Ct. No. SF119150B) |
| v. | |
| XAVIER SPIVEY, | |
| Defendant and Appellant. | |

A jury convicted defendant Xavier Spivey of first degree felony murder (Pen. Code, § 187, subd. (a)),[1] two counts of kidnapping to commit robbery (§ 209, subd. (b)), and two counts of first degree robbery (§§ 211, 212.5, subd. (a)), while sustaining

---

[1]    Undesignated statutory references are to the Penal Code.

1

personal use of a firearm allegations (§ 12022.53, subd. (b)).[2] The trial court sustained a strike allegation and sentenced defendant to 98 years to life plus 24 years.

On appeal, defendant contends it was prejudicial error for the trial court to fail to instruct sua sponte on the logical nexus between the underlying felony and the homicide, letters purportedly from defendant to his mother were admitted without proper foundation, and sentence should be stayed pursuant to section 654 on the robbery or kidnapping counts. We stay sentence on the robbery counts and affirm the judgment as modified.

FACTUAL BACKGROUND

On June 18, 2011, at approximately 11:00 p.m., Brandy Warren and her friend Britney Allison walked out of Warren's house and went to Warren's car. Defendant and codefendant Stedvieno Mayes approached them at Warren's car. Both men wore the hoods of their sweatshirts over their heads. Defendant put a gun with a long clip to Warren's back and ordered her to go back to her home and open the door. Mayes went to Allison, and the four returned to Warren's house.

Once inside the house, defendant and Mayes told to the women to lie down on the kitchen floor. Mayes had a silver .22-caliber pistol and did not say much. Defendant was "[t]earing up the house" and saying, " 'Where is the money? Where's the gun.' " After about 20 minutes, Mayes told Warren and Allison to get in the bathtub and start counting. He also told them if they did not count long enough he would be outside waiting for them. Warren believed this was a threat to shoot them if they did not remain in the house long enough.

Warren and Allison stayed in the bathroom for a minute or two and then went to lock the front door. Before they reached the door, Warren's neighbor Myron Dorsey and

---

[2]     Defendant and Stedvieno Mayes were jointly tried with separate juries (C073853).

two other men entered the house, stayed for a minute or two, and left. Warren then locked the front door and called her grandmother. She subsequently identified defendant and Mayes in photographic lineups.

That evening, Dorsey was hanging out on the front porch of his mother's house with his younger brother Brian Walker and two of Walker's friends. The house was across the street and four to five doors from Warren's home. Dorsey saw Warren and Allison walk to Warren's car that evening. Two men he did not recognize walked from a truck towards Warren and Allison. The men then went into Warren's house with Warren and Allison.

About 15 to 20 minutes later, Dorsey went to the side of his mother's house to throw away beer cans. He heard a sound like a firecracker and Walker say he was hit. Dorsey ran to Warren's house to ask about the men who entered it. Warren fainted when she tried to talk to him. Dorsey heard a truck drive off; he later noticed that the truck parked on the corner was gone.

Walker died of internal bleeding from a gunshot wound to the pelvis that damaged several arteries.

On June 23, 2011, officers executed a search warrant at an apartment and found indicia that Mayes lived there. A loaded shotgun was found under the cushions of the living room couch, and a loaded .45-caliber assault weapon with a magazine and silencer was found in the bedroom closet. The bullet that killed Walker was a .45-caliber bullet exhibiting six lands and grooves with a right hand twist. The firearm found in defendant's closet was a .45-caliber weapon and also exhibited six lands and grooves with a right hand twist. The type of bullet used to kill Walker prevented finding an exact match with any specific firearm, including the one found in defendant's closet. Bindles of heroin were found in a box in the bedroom. Cocaine base was found in plastic baggies in the pocket of a pair of pants. Warren's identification card, social security card, credit card, and handgun safety certificate were also in the home.

On March 6, 2012, a detective received a tip that two letters of interest to law enforcement had been sent to defendant's mother. Ken Simmons, the ex-husband of defendant's mother, turned over the letters. The first letter, read at the trial, began with the salutation, " 'Dear Momma,' " and stated in pertinent part as follows: " 'He's gonna try to contact you so you can verify my knowing Brandy and having a crush on her. All you need to do is tell them I'm telling the truth and that you and her mom is friends.' [¶] . . . [¶] 'I told him that I was with Brandy, kicking it with her the night she said she got robbed. All you need to do is tell them, yeah, I know her and kick it from time to time.' [¶] . . . [¶] 'We haven't found out if she gonna testify or not, but like I told you before, contact her and let her know it's money on the table to not show up, $20,000, ten for her, ten for her partner. Can you do that for me, please, mama.' [¶] . . . [¶] 'They have no evidence as of right now on the murder, but some could still pop up down the line.' [¶] . . . 'They got Brandy and her friend saying it was me. That's all they got. Other than her, Imma win this case.' " The letter was signed, " 'Always, Xavier D. Spivey.' "

The second letter, which also began with, " 'Dear Momma,' " and also read at the trial, stated in pertinent part as follows: " 'I need you to ask my dad he's willing to put up $20,000 for the broad not to show up at court. And gonna try $10,000 first. I need to get in touch with Brandy and let her know it's $10,000 on the table not to come to court. She's the only evidence in my case. Her name is Brandy Warren and Britney Allison. Look them up on Facebook, Google them or something, however you got to do it. Get in touch with her, offer her some dough to not show up. I would appreciate that of you. Enjoy your day, which I excuse myself.' " The letter was signed, " 'Always, Xavier D. Spivey.' "

A letter from defendant addressed to his wife, Sofia Spivey, was intercepted from jail. The letter included the following: "I hope we beat this case. I pray the witness don't show up and they drop this shit. They dropped that charge because they can't prove who fired the gun [and] if they can't prove who fired it how is they gone [*sic*]

4

prove it was even us. . . . I hope you already called my attorney about my mental situation. That's my way out if they got to . . . evidence on me which they shouldn't. I could go to the crazy house for a couple of years. . . ."

DISCUSSION

I

Defendant contends it was prejudicial error for the trial court not to give an instruction sua sponte on the nexus between the homicide and the felonies. We disagree.

The prosecution's theory was felony murder with defendant as either the shooter or as an aider and abettor. The felony-murder rule holds those who commit specified felonies strictly responsible for any killing committed by a cofelon during the commission or attempted commission of the felony, whether the killing is intentional, unintentional, or accidental. (*People v. Cavitt* (2004) 33 Cal.4th 187, 197 (*Cavitt*).)

In *Cavitt*, the Supreme Court recognized felony-murder liability was not predicated on the killing having to advance the underlying felony. (*Cavitt, supra*, 33 Cal.4th at p. 198.) "Instead, for a nonkiller to be responsible for a homicide committed by a cofelon under the felony-murder rule, there must be a logical nexus, beyond mere coincidence of time and place, between the felony the parties were committing or attempting to commit and the act resulting in death."[3] (*Id.* at p. 201.) The instructions given in *Cavitt*,[4] which informed the jury "that 'the killing occurred *during*

---

[3]  In addition to a logical nexus, there must also be a temporal relationship between the underlying felony and the homicide. (*Cavitt, supra*, 33 Cal.4th at p. 193.)

[4]  The *Cavitt* jury was instructed in conformance with CALJIC No. 8.27, which read in pertinent part: " 'If a human being is killed by one of several persons engaged in the commission of the crime[s] of burglary or robbery, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder in the first degree, whether

5

the commission or attempted commission of robbery or burglary' by 'one of several persons *engaged in the commission*' of those crimes" sufficiently "apprised the jury of the need for a logical nexus between the felonies and the homicide." (*Id.* at p. 203, original italics.) Since the existence of a logical nexus between the killing and the felony was not an element of the crime, there was no duty sua sponte for the trial court to clarify it when the matter was not at issue. (*Id.* at p. 204.) The trial court had a duty to instruct only when the evidence raises an issue as to the existence of a logical nexus between the felony and the homicide. (*Ibid.*)

The jury in this case was given the standard jury instruction on felony murder under an aider and abettor theory, CALCRIM 540B,[5] and on the requirement the felony and homicide must be part of one continuous transaction, former CALCRIM No. 549.[6]

the killing is intentional, unintentional, or accidental.' " (*Cavitt, supra*, 33 Cal.4th at p. 203, fn. 4.)

[5] The jury was instructed with CALCRIM No. 540B in pertinent part as follows: "The defendant is charged in Count 1 with murder, under a theory of felony murder. [¶] The defendant may be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death. I will call the other person the perpetrator. [¶] To prove that the defendant is guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendant committed, or aided and abetted kidnapping and/or robbery; [¶] 2. The defendant intended to commit, or intended to aid and abet the perpetrator in committing kidnapping and/or robbery; [¶] 3. If the defendant did not personally commit kidnapping and/or robbery, then a perpetrator, whom the defendant was aiding and abetting, personally committed kidnapping and/or robbery; [¶] [AND] [¶] 4. While committing kidnapping and/or robbery, the perpetrator caused the death of another person. [¶] A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent." The jury was also instructed on felony liability for the killer CALCRIM No. 540A. That instruction is irrelevant to defendant's contention as the logical nexus requirement applies only to first degree murder liability for a defendant who is not the actual killer. (See *Cavitt, supra*, 33 Cal.4th at p. 201.)

[6] The jury was instructed with former CALCRIM No. 549 as follows: "In order for the People to prove that the defendant is guilty of murder under a theory of felony murder, the People must prove that the kidnapping and/or robbery and the act causing the death were part of one continuous transaction. The continuous transaction may occur

6

Defendant did not request and the trial court did not give a clarifying instruction on the logical nexus between the homicide and the felonies.

Defendant argues "the evidence here raised a 'logical nexus' issue." According to defendant, "[i]t was unclear who fired the fatal shot, and it was a mystery as to why that shot was fired." From this, he concludes the court had a sua sponte duty to give a clarifying instruction on the issue.

Defendant's sparse argument misunderstands the logical nexus requirement. As in *Cavitt*, the standard jury instruction given here apprised the jury of the logical nexus requirement by informing the jury that the People must prove one of the perpetrators committed the homicide during the commission of the robbery and/or the kidnapping, and the homicide and felonies must be part of one continuous transaction. The fact defendant's accomplice may be the actual killer rather than defendant is insufficient to require further instruction on logical nexus, as the logical nexus requirement applies only if the accused is not the actual killer. (See *Cavitt, supra*, 33 Cal.4th at p. 201.) The apparent lack of motive likewise does not support a sua sponte duty to instruct. "[A] nonkiller's liability for felony murder does not depend on the killer's subjective motivation but on the existence of objective facts that connect the act resulting in death to

---

over a period of time and in more than one location. [¶] In deciding whether the act causing the death and the felony were part of one continuous transaction, you may consider the following factors: [¶] 1. Whether the felony and the fatal act occurred at the same place; [¶] 2. The time period, if any, between the felony and the fatal act; [¶] 3. Whether the fatal act was committed for the purpose of aiding the commission of the felony or escape after the felony; [¶] 4. Whether the fatal act occurred after the felony but while [one or more of] the perpetrator[s] continued to exercise control over the person who was the target of the felony; [¶] 5. Whether the fatal act occurred while the perpetrator[s] were fleeing from the scene of the felony or otherwise trying to prevent the discovery or reporting of the crime; [¶] 6. Whether the felony was the direct cause of death; [¶] AND [¶] 7. Whether the death was a natural and probable consequence of the felony. [¶] It is not required that the People prove any of these factors or any particular combination of these factors. The factors are given to assist you in deciding whether the fatal act and the felony were part of one continuous transaction."

the felony the nonkiller committed or attempted to commit." (*Id.* at p. 205.) Since felony-murder liability can be predicated on an accidental killing, the killer does not even need a motive to kill or harm the victim.

Our Supreme Court suggests situations requiring additional instruction on the logical nexus between the felony and the homicide will be at best rare. Felony-murder liability requires only that "the parties to have been jointly engaged in the perpetration or the attempt to perpetrate the felony at the time of the act resulting in death. A confederate who performs a homicidal act that is completely unrelated to the felony for which the parties have combined cannot be said to have been 'jointly engaged' in the perpetration or attempt to perpetrate the felony at the time of the killing. Otherwise, 'if one of two burglars ransacking a home glances out of a window, sees his enemy for whom he has long been searching and shoots him, the unarmed accomplice, party only to the burglary, will be guilty of murder in the first degree.' [Citation.]" (*Cavitt, supra*, 33 Cal.4th at p. 200.)

Dorsey heard the shot before hearing the truck drive off. Therefore, the murder victim, Walker, was shot before the defendants could complete the felony by entering their truck and driving off. (See *Cavitt, supra*, 33 Cal.4th at p. 208 ["The 'escape rule' defines the duration of the underlying felony, in the context of certain ancillary consequences of the felony [citation], by deeming the felony to continue until the felon has reached a place of temporary safety"].) Although Walker was not a victim of the underlying felonies, he was, like his brother Dorsey, a potential witness to the robbery and kidnapping by being able to observe defendants enter and leave Warren's home. Since the evidence shows the killing was committed during the felony and there is no evidence showing the killing was completely unrelated to the robberies and kidnappings,

8

the trial court was under no duty sua sponte to give a clarifying instruction on logical nexus.[7]

## II

Defendant contends the trial court committed prejudicial error by admitting two letters from defendant to his mother.

## A.

At trial, Stockton Police Detective Robert Faine testified he received an anonymous tip defendant sent two letters to his mother, Margorie Paul, at her home. Detective Faine eventually contacted Paul's ex-husband, Ken Simmons, who gave him the two letters. Detective Faine read the letters and they were logged into evidence. Defense counsel objected for lack of foundation. The trial court held a bench conference. Following the conference, the prosecutor questioned Detective Faine on another topic before asking the trial court for a ruling on the foundation objection. The trial court decided it would allow "questions to lay a further foundation for authentication," pursuant to Evidence Code section 1400 et seq., subject to a motion to strike.

The prosecutor elicited from Detective Faine defendant was in Duel Vocational Institute in Tracy when the detective received the letters on March 15, 2012. Detective Faine did not know defendant's inmate number; when the prosecutor sought to refresh his memory with a document, the defense raised a hearsay objection, which led to another bench conference. After the prosecutor referred to defendant's section 969(b) packet, Detective Faine recalled defendant's inmate number was G45955. That same number was on the return address of the first letter, along with a Tracy post office box number.

---

[7] Defendant's claim that counsel was ineffective in failing to request a clarifying instruction is also without merit. Since the trial court adequately instructed the jury on the temporal nexus requirement and logical nexus was not at issue, counsel could reasonably conclude that further instruction was not necessary.

The letter was addressed to Paul, started with the salutation, " 'Dear Momma,' " and ended with. " 'Always, Xavier D. Spivey.' " The second letter had the same return address, defendant's inmate number, and the same Tracy post office box number. The letter was also addressed to Paul. The salutation was, " 'Dear Momma,' " and the letter ended with, " 'Always, Xavier D. Spivey.' "

Detective Faine testified to the partial contents of the letters, in which defendant asked his mother to help arrange payments to Warren and her friend in return for not testifying against him. On cross-examination, Detective Faine testified the letters were open when Simmons gave them to him. Simmons told Detective Faine he got the letters from a woman who was living with Paul. The woman told Simmons she did not open the letters, but Simmons opened them before handing the letters over to Detective Faine. Simmons said he did not alter the letters. Detective Faine said he did not compare Simmons' handwriting with that in the letters. The defense raised no additional objections to the letters and did not move to strike them.

B.

Defendant claims the letters lacked a proper foundation because there was no testimony the letters were in his handwriting or that he ever possessed or wrote the letters. Defendant additionally notes the chain of custody for the letters creates "substantial potential for the evidence to have been created by someone other than [defendant], and the prosecution could not demonstrate otherwise."

Defendant's failure to move to strike the writings or renew his objection forfeits his contention. (Evid. Code, § 353, subd. (a) [objections must be timely and specific]; see *People v. Holford* (2012) 203 Cal.App.4th 155, 168-170.) Since defendant claims trial counsel was ineffective in failing to renew the objection, we address the letters' admissibility.

A writing must be authenticated before it may to be admitted into evidence. (Evid. Code, § 1401, subd. (a).) "Authentication of a writing means (a) the introduction of

10

evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (*Id*. at § 1400.)

After the trial court makes a preliminary finding sufficient facts exist to authenticate a document, " 'the authenticity of the document becomes a question of fact for the trier of fact.' [Citation.]" (*Thorstrom v. Thorstrom* (2011) 196 Cal.App.4th 1406, 1418.)

The trial court's ruling is reviewed for abuse of discretion. (*People v. Tafoya* (2007) 42 Cal.4th 147, 165; *People v. Williams* (1997) 16 Cal.4th 153, 196-197.) Documents may be authenticated in various ways. "Circumstantial evidence, content and location are all valid means of authentication. [Citations.]" (*People v. Gibson* (2001) 90 Cal.App.4th 371, 383.) "As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility. [Citations.]" (*Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 321.)

The letters were attributable to defendant. They were addressed to his mother, began with the salutation, "Dear Momma," signed with his name, and had his inmate number and a post office box from the city where he was incarcerated on the return address. The content of the letters shows a familiarity with the facts of the case that further ties them to defendant. The circumstantial evidence and the letters' content were adequate to support their admission into evidence. Defendant's contrary arguments go to the weight of the evidence rather than its admissibility.

Since the letters were properly admitted, trial counsel was not ineffective in failing to renew the objection or move to strike the evidence. (See *People v. Diaz* (1992) 3 Cal.4th 495, 562 [no claim for ineffective assistance of counsel based on defense counsel's failure to make a futile objection].)

11

Defendant was convicted of two counts of kidnapping for the purpose of robbery against Warren and Allison in counts 2 and 3 and first degree robbery against Warren and Allison in counts 4 and 5. The trial court imposed consecutive terms for all four counts. He contends punishment for the robbery or kidnapping count as to each victim must be stayed pursuant to section 654. The Attorney General agrees.

Section 654, subdivision (a) provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." "The failure of defendant to object on this basis in the trial court does not forfeit the issue on appeal. [Citation.]" (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338.)

" 'The proscription against double punishment in section 654 is applicable where there is a course of conduct which . . . comprises an indivisible transaction punishable under more than one statute . . . . The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one.' [Citation.] 'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. [Citation.]' [Citation.]" (*People v. Coleman* (1989) 48 Cal.3d 112, 162.)

Warren and Allison were kidnapped solely to facilitate the robbery. Defendant and his accomplice ransacked Warren's home immediately after transporting Warren and Allison inside the house. The robbers then threatened the victims to prevent them from moving, which aided their escape and subsequent completion of the robbery. In short, the robbery and kidnapping were inseparable from each other as part of a single plan. The trial court should have stayed sentence on one of the counts as to each victim.

Section 654 requires the trial court to impose the sentence with the greatest possible term of imprisonment. (§ 654, subd. (a).) Kidnapping for robbery is punishable by life with the possibility of parole (§ 209, subd. (b)(1)), while first degree robbery is punishable by three, four, or six years (§ 213, subd. (a)(1)(B)). Therefore, we modify the judgment to stay sentence on the robbery convictions in counts 4 and 5. Defendant was sentenced to a consecutive 18-year term for the robbery, the firearm and the strike enhancements in count 4 and a consecutive six-year term for the robbery conviction in count 5. Staying sentence on those counts modifies his sentence to 98 years to life.

### DISPOSITION

Sentences on counts 4 and 5 are stayed pursuant to Penal Code section 654. As modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


      NICHOLSON     , Acting P. J.


We concur:


      DUARTE     , J.


      HOCH     , J.