# IN THE SUPREME COURT OF CALIFORNIA

TATANA SPICAKOVA ROMERO et al.,
Plaintiffs, Cross-defendants and Appellants,

v.

LI-CHUAN SHIH et al.,
Defendants, Cross-complainants and Respondents;

U.S. BANK NATIONAL ASSOCIATION,
Cross-defendant and Respondent.

S275023

Second Appellate District, Division Eight
B310069

Los Angeles County Superior Court
EC064933

February 1, 2024

Justice Kruger authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Groban, Jenkins, and Evans concurred.

ROMERO v. SHIH

S275023


Opinion of the Court by Kruger, J.


     This dispute over a residential driveway in Sierra Madre raises a significant question about the law of easements. Under California law, the parties to a sale of real property may grant or reserve easements as part of the transaction. This may be done expressly, in a written instrument, or impliedly, based on clear evidence of the parties' intent. In this case, the trial court concluded that the parties to a 1986 division and sale of two adjacent residential properties intended to create an implied easement over an eight-foot-wide strip of land that belonged to one parcel, but that had been used as the driveway to the home on the neighboring parcel. As a consequence, the current owners of the neighboring parcel may continue to use that strip of land as a driveway.

     The Court of Appeal reversed. The court concluded that regardless of what the parties to the 1986 sale might have intended, the law prohibits a court from recognizing an implied easement that precludes the property owners from making all or most practical uses of the easement area. Because recognizing the neighbors' nonpossessory right to use the land as a driveway would effectively prevent the property owners from using the land for their own purposes, the Court of Appeal concluded that the easement could have been created only in a written instrument and not by implication.

We took this case to decide whether the law imposes such a limitation on the recognition of implied easements. We now conclude that it does not. The evidentiary standard for recognizing an implied easement is a high one, and that standard will naturally be more difficult to meet where, as here, the nature of the easement effectively precludes the property owners from making most practical uses of the easement area. But if there is clear evidence that the parties to the 1986 sale intended for the neighboring parcel's preexisting use of the area to continue after separation of title, the law obligates courts to give effect to that intent.

We reverse and remand for the Court of Appeal to consider whether substantial evidence supports the trial court's finding that an implied easement existed under the circumstances of this case.

## I.

In the early 1940's, Edwin and Ann Cutler (the Cutlers) purchased adjacent parcels of property on West Alegria Avenue in Sierra Madre. Soon after, the Cutlers built a home on the parcel lying to the east, at 643 West Alegria Avenue (the 643 Property). In the years that followed, the Cutlers built a brick garden planter in the front left corner of the yard and next to it, a driveway running along the western edge of the property for its entire length. The planter and driveway encroached by about eight feet onto the Cutler's other parcel, which lay directly to the west at 651 West Alegria Avenue (the 651 Property). A chain-link fence marked the western edge of the driveway and planter, separating the 643 Property and the encroachments from the remainder of the 651 Property. The encroaching area consisted of a strip of land measuring about 8 feet wide by about 157 feet

long, for a total area of almost 1,300 square feet, or about 13 percent of the 651 Property's 10,000-square-foot lot.

Aside from the encroachments, the 651 Property remained undeveloped for several decades. In 1985, the Cutlers allowed their son Bevon and a family friend, David Shewmake, to build a house on the 651 Property so that it could be sold for profit. According to their arrangement, once the house was built and sold, Bevon and Shewmake would use the proceeds from the sale to pay the Cutlers for the land and would retain the profits on the house for themselves.

In furtherance of this project, Edwin Cutler applied to the city to adjust the boundary between the 643 Property and the 651 Property to the line marked by the chain-link fence. The Sierra Madre Planning Commission approved his request, subject to a city engineer's review of the parcel map and boundary line adjustment. But for reasons that are not clear from the record, the process was never completed and the legal boundary line remained as before.

Although the lot line adjustment had not been completed, the Cutlers, Bevon, and Shewmake proceeded much as if it had been. They obtained building permits from the city and completed construction on the house, and the chain-link fence separating the 651 Property from the 643 Property was replaced with a concrete block wall.

In 1986, the Cutlers conveyed the 651 Property to Bevon and Shewmake, and on the same day, Bevon and Shewmake sold the property to another family. Both grant deeds described the 651 Property according to the original boundary lines, without mentioning or accounting for the encroachments on the strip of land along the property's eastern edge. In the years that

followed, the Cutlers executed several grant deeds for the 643 Property that included a legal description of the eight-foot-wide strip. Because the lot line adjustment had not been completed, the Cutlers did not actually own that strip of land; those grant deeds were therefore "wild deeds," outside the chain of title and ineffective to convey title to the area. (See 3 Miller & Starr, Cal. Real Estate (4th ed. 2023) § 8:58, p. 8-175 ["If a deed purports to convey property that is not owned by the grantor, it is ineffective to convey the property, and it is a 'wild deed' that can have no effect on title of the person who holds real title to the property"] fn. omitted.)

The properties remained in this configuration, with the 643 Property making use of the encroaching area as a garden planter and driveway, during the next three decades. The 651 Property was sold once during this period, in 2005. Plaintiffs Cesar and Tatana Spicakova Romero (the Romeros) then purchased the 651 Property in 2014. That same year, defendants Li-Chuan Shih and Tun-Jen Ko (the Shih-Kos) purchased the 643 Property from Ann Cutler's estate.

At the time they purchased their respective properties, neither the Romeros nor the Shih-Kos were aware of any easements, encroachments, or boundary disputes. None had been disclosed by the sellers in the respective purchase agreements or advertising materials, and neither party had taken steps to verify that the concrete block wall separating the properties conformed to the true boundary line. The Romeros did not discover that anything was amiss until about a year after purchasing the 651 Property, when Cesar Romero was taking measurements in his front yard for a landscaping project and realized that the yard was not as wide as he expected. The Romeros commissioned a survey, which confirmed that the 643

4

Property's garden planter and driveway were encroaching on the 651 Property.

The Romeros filed a lawsuit against the Shih-Kos, requesting that the Shih-Kos be ordered to remove all encroachments and pay damages. The Shih-Kos filed a cross-complaint alleging that when the Cutlers separated the 643 and 651 Properties in 1986, they created an implied easement over the disputed area in favor of the 643 Property. In the alternative, the Shih-Kos asked the court to create an equitable easement in favor of the 643 Property over the disputed area, which would entitle the Romeros to compensation for the burden imposed on their property.

The matter proceeded to a bench trial focusing on the easement issue. The parties presented evidence regarding the history of the two properties and the circumstances surrounding their separation in 1986, discussed above, as well as evidence of the effect that the alleged easement would have on each property. As relevant here, the Shih-Kos' appraisal expert, Daniel Poyourow, testified about the uses of the disputed area that would remain to the Romeros' 651 Property if the trial court were to award an easement in favor of the 643 Property. Poyourow explained that the Romeros could continue to use the easement area for "setback purposes" — i.e., to calculate how far any structure must be set back from the true property line — and for "FAR uses" — apparently referring to the "floor area ratio," or the permissible floor area of a building in relation to the size of the lot where the building is located. He also testified that certain subsurface uses remained to the 651 Property — e.g., for the running of underground pipes or cables. On cross-examination, however, Poyourow acknowledged that his appraisal report had characterized the easement as "effectively

exclusive" and that the potential for the 651 Property to take advantage of any remaining uses was "remote." Overall, Poyourow estimated that the "residual value" of the uses of the property to the 651 property represented approximately 2 percent of the value of the disputed area.

After the bench trial, the trial court entered judgment for the Shih-Kos, concluding that they possessed an implied easement over the disputed strip of land. The court found that it was "clear under the circumstances" that when the Cutlers separated and sold the two properties in 1986, "the parties to the transaction intended the 643 Property's encroachment on the 651 Property would continue after the division." Specifically, the court noted that "all the Cutlers, the Shewmakes, and every successive owner of either property (until now) [have] allowed for and/or behaved as if the 643 Property has the right to encroach upon the disputed strip of land with the driveway, planter, and block wall — all of which have remained unchanged in their use and function since at least the initial property separation." The court also determined that the encroachment was reasonably necessary to the beneficial enjoyment of the 643 Property because without the easement, the 643 Property's driveway would be too narrow for normal use.

In finding an implied easement, the trial court rejected the Romeros' argument that California law prohibits the recognition of an implied easement that would effectively exclude the property owner from any practical use of the disputed area. The trial court reasoned that "the focus of the [implied easement] analysis is what the parties intended at the time of the division or conveyance; whether their intended use was exclusive or not is beside the point." The trial court ordered that the implied

easement would run with the land and, "consistent with the original grantor and grantee's intent in 1986, shall terminate if the 643 Property ceases its continued use of the easement for a driveway, planter and wall/fence."

In the alternative, the trial court created an equitable easement over the disputed area in the event the implied easement was overturned on appeal. The court relied on a series of appellate decisions permitting courts in certain situations to exercise their powers in equity to fashion an interest in the owner's land that will protect an innocent encroacher's use of the property, on the condition that the encroacher pay damages to the property owner. (See generally *Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 764–765 (*Hirshfield*).) The court determined that even if the Shih-Kos were ultimately found to have no preexisting right of use, they could continue to use the disputed property but would be obligated to pay damages to the Romeros in the amount of $69,000.

The Court of Appeal reversed on the implied easement issue. (*Romero v. Shih* (2022) 78 Cal.App.5th 326, 362 (*Romero*).) The critical question, the appellate court concluded, was whether the easement was "exclusive." (*Id.* at pp. 349, 350.) Here, according to the Court of Appeal, the implied easement was "exclusive" in the sense that the easement "essentially divests [the Romeros] of nearly all rights that owners customarily have in residential property, including access and practical usage." (*Id.* at p. 354.)

The appellate court acknowledged that California law has recognized similarly "exclusive" easements in cases where the easement was created by express grant and the written instrument either explicitly provided or clearly implied a right

to exclusive use of the easement area (for instance, by indicating that the easement is " ' "for parking and garage purposes" ' "). (*Romero, supra,* 78 Cal.App.5th at p. 350, citing *Blackmore v. Powell* (2007) 150 Cal.App.4th 1593, 1599–1600 (*Blackmore*).) But the court held that the same rule should not obtain for easements implied by law.

The appellate court relied for its conclusion on a line of cases concerning prescriptive easements, which are easements acquired through the open, continuous, and hostile use of another's land. (*Romero, supra,* 78 Cal.App.5th at pp. 350–352.) In those cases, several appellate courts have held that a court cannot recognize a prescriptive easement that has the effect of leaving the fee title holder with no practical use of the land subject to the easement. (*Ibid.*) To recognize such a prescriptive easement, the courts have reasoned, would undermine the integrity of the statute governing the acquisition of a real property estate by adverse possession by permitting claimants " 'to obtain the fruits of adverse possession' " without satisfying the statutory requirements, including the payment of taxes. (*Id.* at p. 350, quoting *Hansen v. Sandridge Partners, L.P.* (2018) 22 Cal.App.5th 1020, 1033 (*Hansen*).) The Court of Appeal in this case found this rationale "based on the distinction between estates and easements — equally applicable to exclusive implied easements." (*Romero,* at p. 352.)[1]

---

[1]     The court noted that some courts have recognized implied "exclusive" easements for encroachments that are either " 'de minimis' " or "necessary to protect the health or safety of the public or for essential utility purposes," but neither description applies to the disputed easement at issue here. (*Romero, supra,* 78 Cal.App.5th at p. 352.)

Having concluded there could be no implied easement over the disputed strip of land in favor of the 643 Property (*Romero*, *supra*, 78 Cal.App.5th at p. 353), the court did not address the Romeros' alternative argument that the implied easement finding was not supported by substantial evidence (*id.* at p. 355). The court did, however, affirm the trial court's imposition of an equitable easement and upheld the award of $69,000 in damages to the Romeros (*id.* at p. 362).

Both sides petitioned for review. We granted the Shih-Kos' petition to decide whether, as the Court of Appeal held, the law forbids recognition of an implied easement that would effectively exclude the property owners from most practical uses of the easement area.

## II.

"Interests in land can take several forms, including 'estates' and 'easements.' " (*Hansen*, *supra*, 22 Cal.App.5th at p. 1032.) "An estate is an ownership interest in land that is, or may become, possessory." (*Ibid.*) "An easement," by contrast, "gives a nonpossessory and restricted right to a specific use or activity upon another's property, which right must be *less* than the right of ownership." (*Mehdizadeh v. Mincer* (1996) 46 Cal.App.4th 1296, 1306 (*Mehdizadeh*).)

The law recognizes several methods of creating an easement. Among other methods, the parties to a real property transaction may grant or reserve an easement as part of the conveyance of land; an individual may acquire an easement by prescription, through the continuous, hostile, and adverse use of the property; or a court acting in equity may order that an easement be created under specified circumstances. (6 Miller & Starr, Cal. Real Estate, *supra*, § 15:13, pp. 15-70–15-72.) The

scope of the easement, like the scope of any servitude on land, "is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired." (Civ. Code, § 806.)

When an easement is granted or reserved as part of a real property transaction, the grant or reservation may appear expressly in the terms of a written instrument. (See, e.g., *Gray v. McCormick* (2008) 167 Cal.App.4th 1019.) But even without a writing, California law recognizes the grant or reservation of the easement by implication in appropriate cases. (See, e.g., *Fristoe v. Drapeau* (1950) 35 Cal.2d 5 (*Fristoe*); see generally 6 Miller & Starr, Cal. Real Estate, *supra*, § 15:19, pp. 15-94–15-95.) " 'The doctrine of implied easements is applied by the courts to carry into effect the intention of the parties as manifested by the facts and circumstances of the transaction.' " (*Horowitz v. Noble* (1978) 79 Cal.App.3d 120, 132 (*Horowitz*).)

California has codified the doctrine of implied easements in Civil Code section 1104 (section 1104). Section 1104, which has remained unchanged since its 1872 enactment, provides: "A transfer of real property passes all easements attached thereto, and creates in favor thereof an easement to use other real property of the person whose estate is transferred in the same manner and to the same extent as such property was obviously and permanently used by the person whose estate is transferred, for the benefit thereof, at the time when the transfer was agreed upon or completed." In other words, when a grantor conveys a portion of an estate to another party but fails to expressly grant an easement in the written instrument, the law infers that the grantor and grantee intended the conveyed portion of the property to enjoy any preexisting uses of the grantor's remaining estate that were "obvious[] and permanent[]," and the law accordingly implies an easement.

(§ 1104; see, e.g., *Kytasty v. Godwin* (1980) 102 Cal.App.3d 762, 768 [§ 1104 "creates an implied easement as an exception to the general rule that interests in real property can only be created by an express writing or by prescription"].) "In such cases, for purposes of identification, the portion or parcel that is being used is called the 'quasi-servient tenement,' and the portion or parcel benefited by the use is called the 'quasi-dominant tenement.'" (6 Miller & Starr, Cal. Real Estate, *supra*, § 15:20, p. 15-98, fn. omitted.) Where the statutory conditions are otherwise satisfied, "if the owner conveys the quasi-dominant tenement, the grantee receives an implied easement for the use and benefit of his or her property over the quasi-servient tenement retained by the owner-grantor." (*Id.* at p. 15-99.)

Though recognized in statutory law, the doctrine of implied easements is at least equally a product of the common law as elaborated in judicial decisions. The cases make clear that the law of implied easements is broader than section 1104, read in isolation, might suggest. For instance, "[a]lthough the Civil Code speaks only in terms of implying an easement in favor of a grantee, 'California also recognizes easements by implied reservation. The result is that a purchaser may take not only the obvious *benefits* but the obvious *burdens* as well.'" (*Horowitz, supra,* 79 Cal.App.3d at p. 133.) In a similar vein, this court has explained that "[t]he factors enumerated in section 1104 of the Civil Code are not exclusive of other possible factors which may have a bearing in ascertaining the extent of an easement created by implication. Section 1104, which relates to the creation of easements by implied grant, must be read with section 806 of the Civil Code, which defines the extent of all servitudes, and also in the light of the common law rules

governing easements by implication." (*Fristoe, supra,* 35 Cal.2d at p. 9.)

Synthesizing the statutory text and common law elaboration of the doctrine, California appellate courts have summarized the elements of an implied easement as follows: "[A]n 'easement will be implied when, at the time of conveyance of property, the following conditions exist: (1) the owner of property conveys or transfers a portion of that property to another; (2) the owner's prior existing use of the property was of a nature that the parties must have intended or believed that the use would continue; meaning that the existing use must either have been known to the grantor and the grantee, or have been so obviously and apparently permanent that the parties should have known of the use; and (3) the easement is reasonably necessary to the use and benefit of the quasi-dominant tenement.' " (*Thorstrom v. Thorstrom* (2011) 196 Cal.App.4th 1406, 1420 (*Thorstrom*).)

Implied easements are not favored in the law. Because an implied easement deprives the property owner of the exclusive use of that property, courts do not lightly infer that the parties intended to create one. (*Orr v. Kirk* (1950) 100 Cal.App.2d 678, 681.) Moreover, given the ordinary rule that courts should construe a reservation in any grant against the grantor, a court "will imply an easement in favor of the grantee more easily than it will imply an easement in favor of a grantor." (*Ibid.*; see Civ. Code, § 1069 ["A grant is to be interpreted in favor of the grantee, except that a reservation in any grant . . . is to be interpreted in favor of the grantor."].) In either case, courts exercise substantial caution in recognizing implied easements, requiring " 'clear evidence' " of the parties' intent, taking into account " ' "the circumstances attending the transaction, the

particular situation of the parties, and the state of the thing granted.” ’ ”  (*Thorstrom*, *supra*, 196 Cal.App.4th at p. 1420; accord, *Walters v. Marler* (1978) 83 Cal.App.3d 1, 21, disapproved on other grounds in *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 507; *Orr*, at p. 681.)

The question before us concerns the recognition of what the Court of Appeal had described as “exclusive” implied easements, by which the court meant an implied easement that “only permits the dominant owner to use the easement area.” (*Romero, supra*, 78 Cal.App.5th at p. 349.)  Some clarification of this usage is helpful.  In general, the term “ ‘exclusive’ ” in the context of easements and other servitudes simply refers to “the right to exclude others.”  (Rest.3d Property, Servitudes (2000) § 1.2, com. c, p. 14.)  The exclusivity of an easement is not so much a binary attribute — either an easement is exclusive or it is not — as a matter of degree.  (*Ibid.* [“The degree of exclusivity of the rights conferred by an easement . . . is highly variable.”].)  Exclusivity in this context “includes two aspects: who may be excluded and the uses or area from which they may be excluded.”  (*Ibid.*)  At one end of the spectrum, easement holders may be limited to narrow, specific uses of the property, and may have “no right to exclude anyone from making any use that does not unreasonably interfere” with those narrow uses.  (*Ibid.*)  At the other end of the spectrum, easement holders may possess “the right to exclude everyone, including the servient owner, from making any use of the land within the easement boundaries.” (*Ibid.*)  When the Court of Appeal in this case used the term “exclusive” easement, it was referring to easements that sit closer to the latter end of this spectrum — to what we might consider “highly exclusive” or “broadly exclusive” easements.

Though an easement may be broadly exclusive, it is nonetheless necessarily limited in scope. An easement is "considered a nonpossessory interest in land because it generally authorizes limited uses of the burdened property for a particular purpose," leaving the property owner "the right to make all uses of the land that do not unreasonably interfere with exercise of the rights granted by the [easement]." (Rest.3d Property, Servitudes, *supra*, § 1.2, com. d, pp. 14–15.) Broadly exclusive easements "may involve uses that make any actual use of the premises by the transferor unlikely, but they are still considered nonpossessory interests if the transferor is not excluded from the entire parcel and retains the right to make uses that would not interfere with the easement." (*Id.* at p. 15.) When an exclusive easement has been established, a dominant tenement owner may use the easement area only for a limited set of purposes, and the easement may be terminated if the dominant tenement owner ceases to use the area for those purposes. (6 Miller & Starr, Cal. Real Estate, *supra*, § 15.77, pp. 15-282–15-284; *McCarty v. Walton* (1963) 212 Cal.App.2d 39, 45.)

The easement the trial court recognized here fits this model: It was broadly exclusive, in that it gave the Shih-Kos a right to use the easement in a manner that effectively excluded the Romeros from most practical uses of the surface area, if not the areas below and above the surface, but it was nonetheless limited in that it preserved the Romeros' property rights not inconsistent with the Shih-Kos' usage, including the right to terminate the easement if the Shih-Kos ceased to use it for the specified limited purposes.

The question now before us is whether, as the Court of Appeal held, an implied easement that excludes the servient

tenement owner from making most practical uses of the easement's surface area is impermissible as a matter of law. As the Court of Appeal acknowledged, effectively exclusive easements are not impermissible as a general matter. Courts have upheld granted or reserved easements of comparable scope where the parties have expressly granted or reserved a restricted right of use as part of the transaction. (*Romero*, *supra*, 78 Cal.App.5th at p. 350; see, e.g., *Gray v. McCormick*, *supra*, 167 Cal.App.4th at p. 1029; *Blackmore*, *supra*, 150 Cal.App.4th at pp. 1599–1601.) The Court of Appeal held, however, that California law prohibits courts from recognizing effectively exclusive *implied* easements, as distinct from express easements.

The Court of Appeal relied for this conclusion on a line of cases pertaining to easements acquired by prescription. The cases begin with *Raab v. Casper* (1975) 51 Cal.App.3d 866, in which the defendants had built a house near the boundary line dividing their property from the plaintiffs' property and inadvertently built "part of their driveway, utility lines, yard and landscaping on plaintiffs' land." (*Id.* at p. 876.) The trial court awarded the defendants a prescriptive easement over the land containing the encroachments, but the Court of Appeal reversed. (*Id.* at p. 878.) The appellate court understood the trial court's judgment as "designed to exclude plaintiffs from defendants' domestic establishment, employing the nomenclature of easement but designed to create the practical equivalent of an estate." (*Id.* at p. 877.) "Achievement of that objective," the court held, "required proof and findings of the elements of adverse possession, not prescriptive use." (*Ibid.*) Because the defendants had not established the necessary elements of adverse possession — in particular, the requirement

that the defendants paid taxes on the disputed land (see Code Civ. Proc., § 325) — the court reversed the judgment. (*Raab*, at pp. 877–878.)

Several courts have since followed *Raab* in prohibiting the acquisition of an easement by prescription where the easement would deprive the property owner of all or most practical uses of the easement area. (See *Hansen, supra*, 22 Cal.App.5th at p. 1034 [rejecting prescriptive easement for farming that would not allow the owner "to use the [d]isputed [l]and for any 'practical purpose'"]; *Mehdizadeh, supra*, 46 Cal.App.4th at pp. 1305, 1308 [rejecting prescriptive easement that was limited to "landscaping and recreation" because the easement would leave the owner with "only a minimal right to use it"]; *Silacci v. Abramson* (1996) 45 Cal.App.4th 558, 564 (*Silacci*) [rejecting prescriptive easement for an enclosed yard that would "amount[] to giving [the true owner's] land completely, without reservation, to [the encroacher]"]; *Harrison v. Welch* (2004) 116 Cal.App.4th 1084, 1093 [rejecting prescriptive easement for use as a woodshed because " 'as a practical matter [such use] . . . prohibits the true owner from using his land' "].)

The concern underlying this line of cases — that claimants could "obtain the fruits of adverse possession under the guise of a prescriptive easement" — arises because of the high degree of similarity between the elements of a prescriptive easement and the elements of adverse possession. (*Hansen, supra*, 22 Cal.App.5th at p. 1033.) Both the law of prescriptive easements and the law of adverse possession permit a party to acquire rights to property through their own unilateral conduct — that is, by using or occupying the property — and, generally speaking, the elements of the doctrines closely resemble each other. (*Id.* at pp. 1032–1033.) Crucially, however, adverse

possession requires claimants to prove that they have paid taxes assessed against the property in order to claim title. (*Ibid.*; Code Civ. Proc., § 325, subd. (b).) The creation of easements by prescription does not. To ensure adherence to this statutory tax requirement, the courts in the *Raab* line have considered it "especially important to maintain the distinction between easements and estates *in the context of prescription.* (See Code Civ. Proc., § 325, subd. (b).) That is, if courts allowed claimants to obtain by prescription a functional estate without satisfying the statutory requirements of adverse possession, then Code of Civil Procedure section 325, subdivision (b)'s tax requirement would be nullified." (*Hansen*, at p. 1036.)[2]

The Court of Appeal in this case believed the logic of the exclusive prescriptive easement cases equally applicable to implied easement cases. We are not convinced. Prescriptive easement cases like *Raab* and *Hansen* are grounded in a concern for maintaining the integrity of the adverse possession statute and its demanding standard for the acquisition of another's

---

[2] The appellate case law is not uniform in forbidding broadly exclusive prescriptive easements. (See *Otay Water Dist. v. Beckwith* (1991) 1 Cal.App.4th 1041, 1048 [granting prescriptive easement that excluded servient tenement owner where uses of the property were limited to "reservoir purposes only"]; cf. *Hirshfield, supra,* 91 Cal.App.4th at p. 769, fn. 11 [questioning breadth of rule stated in the *Raab* line of cases: "Since the scope of a prescriptive easement is determined by its historical use [citations], and since exclusive easements, while rare, are possible [citation], we believe the holdings [of the cases] may be overbroad."].) We do not decide here whether *Otay*, *Raab*, or any of the other so-called exclusive prescriptive easements were decided correctly. The only question now before us concerns the law of implied easements, which are materially different from easements acquired by prescription.

property through occupation. (*Hansen*, *supra*, 22 Cal.App.5th at p. 1036.) But as *Hansen* itself recognized, not all easement claims raise the same concerns. (*Ibid*.) *Hansen* acknowledged that courts have permitted exclusive express easements, for instance. (*Id.* at p. 1035.) But it explained that, unlike in prescriptive easement cases, express easement cases involve no danger that the claimant could shoehorn what is in reality a claim for adverse possession, which has nothing to do with the terms of a land transaction, into a cause of action for an express easement, which has everything to do with the terms of a land transaction and nothing to do with the claimant's hostile use of the property. (*Id.* at p. 1036.) In other words, "permitting *express* exclusive easements does not create the same statutory nullification issue that *prescriptive* exclusive easements do." (*Ibid*.)

In this regard, implied easements are similar to express easements; to recognize an implied easement creates none of the statutory nullification concerns underlying the *Raab* line of cases. To establish the existence of an implied easement, a plaintiff must allege and prove a specific set of circumstances surrounding a particular land transaction: that a common owner of property conveyed a portion of that property to another, that the parties to the transaction must have intended to maintain the benefits and burdens between the newly divided estates after the separation of title, and that the resulting easement was reasonably necessary to the dominant estate. (See 6 Miller & Starr, Cal. Real Estate, *supra*, § 15:20, pp. 15-97–15-102; accord, *Thorstrom*, *supra*, 196 Cal.App.4th at p. 1420.) Those circumstances bear little resemblance to the elements of adverse possession, which, again, does not concern the terms (either express or implied) of a land transaction. For

that reason, there is little reason to fear that claimants might seek an implied easement merely as a means of circumventing the statutory tax requirement or some other adverse possession element. Thus, while it may be necessary to prohibit courts from recognizing prescriptive easements that effectively exclude the property owner from the easement area, the same is not true in express or implied easement cases. (Cf. *Hirshfield, supra*, 91 Cal.App.4th at pp. 768–769 [distinguishing equitable easements on the same ground].)

Unlike in prescriptive easement cases, the court's primary duty in cases involving easements created by grant or reservation — whether express or implied — is to give effect to the intent of the parties to the relevant land transaction. In cases involving express easements, at least, courts have long recognized this duty, even when following the parties' intent produces unusually expansive rights of use. As the Court of Appeal in this case acknowledged, courts have generally held that even when a written instrument does not explicitly state that a granted easement is to be exclusive, courts may nevertheless recognize an exclusive easement where there is a clear indication of such an intention. (See, e.g., *Romero, supra*, 78 Cal.App.5th at p. 350; cf. *Pasadena v. California-Michigan etc. Co.* (1941) 17 Cal.2d 576, 578–579 [case involving an express easement noted that "[n]o intention to convey such a complete interest [that would permit the dominant tenement owner to exclude others from the easement area] can be imputed to the owner of the servient tenement in the absence of a clear indication of such an intention"].)

In *Gray v. McCormick, supra*, 167 Cal.App.4th at page 1022, for example, the court enforced the express terms of a residential development's Master Declaration of Covenants,

19

Conditions, Restrictions and Reservation of Easements (Master CC&Rs), which granted an "exclusive easement" to Lot 6, the dominant tenement, over a 16-foot-wide by 90-foot-long strip of land on Lot 3, the servient tenement. The dominant tenement owners sought to improve the strip of land with a driveway, perimeter walls, and landscaping, and to prohibit the servient tenement owners from making any use of the easement area. (*Id.* at p. 1023.) The servient tenement owners conceded that the Master CC&Rs expressly created an easement, but they objected to the dominant tenement owners' characterization of its scope. Specifically, they argued that the label "exclusive" did not evince an intent to exclude them from their own property. (*Id.* at p. 1025.) A contrary interpretation, they asserted, would violate the law by effectively "grant[ing] the owners of the dominant tenement fee ownership over the easement area." (*Id.* at p. 1029.) The appellate court rejected the argument. The court reasoned that the easement provision "repeatedly uses language of exclusivity," and that any uncertainty about the meaning of that language was dispelled by the surrounding context, which imposed on the dominant tenement owners the costs of improving and maintaining the easement area and required them to indemnify the servient tenement owners for any liability resulting from the exclusive use of the easement. (*Id.* at p. 1026.)

Similarly, in *Blackmore, supra*, 150 Cal.App.4th at page 1597, the court construed an express easement "for 'parking and garage purposes' over a defined area" on the servient tenement, holding that the dominant tenement owner could construct a garage on the easement area for the owner's exclusive use. The court concluded that "exclusive use of the garage" was " 'a necessary incident' of the easement," because "a

20

shared garage would generate disputes about allocation of parking spaces, security, and maintenance costs." (*Id.* at p. 1599.)

In such cases, California appellate courts have recognized that exclusive easements, while rare, can exist where the parties' intent is sufficiently clear in the written instrument creating the easement. (See also *Heath v. Kettenhofen* (1965) 236 Cal.App.2d 197, 206 [dominant tenement owner entitled to exclusive use of 10-foot-wide strip within easement area for parking].) Implied easement cases are not fundamentally dissimilar. Just as in cases where a court must interpret the terms of a written conveyance, the court's duty in an implied easement case is to give effect to the intent of the parties. (*Fristoe, supra*, 35 Cal.2d at p. 8.) As we explained in *Fristoe*, this principle accords with the overarching instruction in Civil Code section 806, that " 'the extent of a servitude is determined by the terms of the grant.' " (*Fristoe*, at p. 9.) We observed: "Under this section . . . , the controlling factor is the terms of the grant. When the grant is implied, its terms must be inferred from all of the circumstances of the case. The effect of section 806 is to establish intent as the criterion, and this is in accord with the rationale of the rules governing easements by implication." (*Ibid.*) Nothing in the language of the statutes suggests a limitation to this principle whereby the parties must preserve a certain quantum of practical uses for the owner. (See Civ. Code, §§ 806, 1104.) The scope of the burden imposed on the servient tenement is determined by the parties' intent (*ibid.*), even if that intent was to create a privilege to use the property in a way that effectively precludes the property owners from making their own use of the easement area.

Although the parties have not cited, and we have not found, any cases directly addressing the question presented here concerning implied easements, California appellate courts have generally measured the scope of an implied easement by following the intent of the parties, regardless of whether giving effect to that intended scope would mean precluding the servient tenement owner from making most practical uses of the land. In *Dixon v. Eastown Realty Co.* (1951) 105 Cal.App.2d 260, for example, the court recognized an implied easement over a small area of the plaintiffs' land that contained an encroaching portion of the defendant's garage, which effectively excluded the plaintiffs entirely from the disputed area. (*Id.* at pp. 263–264.) Likewise, in *Zeller v. Browne* (1956) 143 Cal.App.2d 191, the court recognized an implied easement over a strip of land on the defendants' property that contained a concrete walkway, stairway, and retaining wall, providing the plaintiff an apparently exclusive pathway to access a higher elevation at the rear of their house. (*Id.* at pp. 194–195.) In *Thorstrom*, by contrast, the court reversed a trial court judgment "that granted defendants an implied easement for exclusive use of water from a well on" the plaintiff's property. (*Thorstrom*, *supra*, 196 Cal.App.4th at p. 1411.) The court concluded that "the scope of the easement granted to defendants is excessive" (*ibid.*) — but not because implied easements that prevent the servient tenement owner from using the easement are impermissible as a matter of law. Rather, the court held that the scope of the easement was impermissibly broad only because there was no evidence in the record suggesting that the well "was drilled, constructed and used to benefit defendants' parcel alone." (*Id.* at p. 1423.) Accordingly, the plaintiffs retained the right, as the owners of the servient tenement, to use the well on their

property in any manner that did not interfere with the defendants' own reasonable residential uses. (*Id.* at pp. 1423–1424; see *Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 702 ["Every incident of ownership not inconsistent with the easement and the enjoyment of the same is reserved to the owner of the servient estate."].) The reasoning of these cases suggests that an implied easement, like an express one, may effectively exclude the servient tenement owner from the easement area in rare cases where the circumstances show that the relevant parties clearly intended that result.

Taking a different view, the Court of Appeal posited that implied easements are essentially different from easements where "the language of the creating instrument clearly expresses an intention that the use of the easement area shall be exclusive to the dominant owner." (*Romero*, *supra*, 78 Cal.App.5th at p. 350.) But the court did not explain why it thought that such an intention must be memorialized in the creating instrument and may not be found elsewhere. Perhaps the court believed that in order to convey an interest as comprehensive as an exclusive easement, a party should have to do so in writing, much as if the party were conveying ownership of the land. (Cf. Civ. Code, § 1624, subd. (a)(3) [the Statute of Frauds, which requires a contract "for the sale of real property, or of an interest therein," to be made in writing].) But the doctrine of implied easements is a settled exception to the Statute of Frauds. (1 Miller & Starr, Cal. Real Estate, *supra*, § 1:74, pp. 1-277–1-278.) Courts have recognized this exception as necessary to avoid injustice when the circumstances of the transaction have mitigated the evidentiary concerns underlying the general rule that interests in land must be transferred in

writing.  (See Rest.3d Property, Servitudes, *supra*, § 2.11, com. c, p. 155.)

Or perhaps the appellate court's concern was simply a practical one:  If a court is to recognize an easement so comprehensive as to effectively preclude the property owner's practical use of the land, it should be very certain that this is what the parties intended.  If this was indeed the court's concern, we share it.  But an express statement requirement goes farther than necessary to respond to the concern.  Given the consequences of recognizing an easement where the parties' intent to create one appears only by implication rather than expressly in a written instrument, the common law already requires claimants seeking to establish such implied intent to clear a high bar:  The preexisting use of the quasi-servient tenement must have been " 'so obviously and apparently permanent' " that the law may conclude " 'the parties *must have* intended or believed that the use would continue' " after the division of the property.  (*Thorstrom*, *supra*, 196 Cal.App.4th at p. 1420, italics added.)

Again, easements by implication are not favored in the law.  But where the circumstances of a land transaction clearly evince an intent to continue the quasi-dominant tenement's preexisting uses of the quasi-servient tenement, and where the circumstances also clearly evince an intent that the easement be comprehensive in scope, the bar is cleared and the relevant legal requirements have been satisfied.  (Cf. Rest.3d Property, Servitudes, *supra*, § 2.11, com. c, p. 155 ["servitude burdens are established by implication only . . . where the evidentiary concerns underlying the Statute of Frauds have been met"].)  In discerning the intended scope of an easement, we see little reason to distinguish between an intent clearly expressed in

writing and an intent clearly inferable from "all the facts and circumstances." (*Fristoe*, *supra*, 35 Cal.2d at p. 8.)

To give effect to implied easements, even when those easements may be comprehensive in scope, protects the reasonable expectations of the parties to land transactions in a manner consistent with the usual presumption that the parties " 'contract[ed] in reference to the condition of the property at the time of the sale.' " (*Rosebrook v. Utz* (1941) 45 Cal.App.2d 726, 729 (*Rosebrook*).) Here, for example, the trial court concluded that any reasonable person observing the two properties in 1986, when the Cutlers divided them, would have assumed the 643 Property retained at least some continuing interest in the disputed strip of land. The trial court further found that the Cutlers' successors made just that assumption: For almost 30 years, between the original separation of the properties in 1986 and the Romeros' discovery of the encroachments in 2015, "every successive owner of either property (until now) has allowed for and/or behaved as if the 643 Property has the right to encroach upon the disputed strip of land with the driveway, planter, and block wall — all of which have remained unchanged in their use and function since at least the initial property separation." The question of whether the trial court's findings are supported by substantial evidence remains to be considered. But if these are indeed the facts of the case, they offer a concrete illustration of why a blanket prohibition on exclusive implied easements would encourage litigation to upset long-standing and until-now settled uses of the property.

The Romeros suggest, on the flip side, that our conclusion will create uncertainty in land titles. The argument is that by permitting the recognition of exclusive implied easements, we will undermine the ability of buyers to rely on readily available

and accurate legal descriptions of property contained in recorded deeds. (See *Mehdizadeh, supra,* 46 Cal.App.4th at p. 1308.) The same concern inheres to some extent in every case involving an implied easement, because an implied easement by definition is not expressly set out in any written conveyance. The law, however, treats that concern as outweighed by the interest in protecting the reasonable expectations of landowners and purchasers by giving effect to what the parties " 'must have intended' " given the " 'obvious[] and apparently permanent' " nature of the preexisting use. (*Thorstrom, supra,* 196 Cal.App.4th at p. 1420; see also *Rosebrook, supra,* 45 Cal.App.2d at p. 729.)[3]

Contrary to the Romeros' argument, our conclusion does not "pervert[] the classical distinction in real property law between ownership and use." (*Silacci, supra,* 45 Cal.App.4th at p. 564.) As we have already explained, there remain important differences between an easement with even this degree of exclusivity and an estate or ownership interest. The trial court's judgment granted the Shih-Kos the right to maintain the preexisting use of the disputed strip of land as a driveway, garden planter, and concrete block wall; it did not give the Shih-Kos the right to make any other use of the disputed area. And although the trial court determined the easement would run with the land, it ordered that the easement would terminate if the 643 Property ceased to use the disputed area for those

---

[3] Here, the "obviously and apparently permanent" nature of the use in question means that the Romeros could have discovered the existence of the easement with reasonable diligence at the time they purchased the 651 Property.

preexisting, limited uses. The Romeros benefit from this limitation because they are provided certainty that the easement area will never be used for any activity that might have a more intrusive impact on their property. Moreover, as the Shih-Kos' appraisal expert testified at trial, the Romeros retained any rights to use the strip of land that would not interfere with the 643 Property's easement — namely, the right to any subsurface uses, however often there might be a need for them, and the right to use the easement area to calculate the minimum setback from the property line and the maximum floor area ratio of their home under applicable zoning laws.

The easement therefore is not so comprehensive in scope as to extinguish the servient tenement owner's property rights in the disputed area. Though the Shih-Kos possess a right to exclude the Romeros from the driveway, they are not permitted to exclude the Romeros from *all* potential uses of the easement. And because the Shih-Kos may only use the land for a driveway, a garden planter, and a concrete block wall, the Romeros retain the right to terminate the easement if the property is used for another purpose. These differences are sufficient to distinguish the rights accorded to the Shih-Kos by the trial court from a fee interest. (See *Gray v. McCormick, supra,* 167 Cal.App.4th at p. 1031 ["Here, the owners of Lot 6 have not acquired fee title to the easement area; rather, their use of the [exclusive] easement area is limited to access, ingress and egress purposes, not all conceivable uses of the property."]; *Blackmore, supra,* 150 Cal.App.4th at p. 1600 [noting that the exclusive use of a garage on the easement area "does not rise to fee ownership" because the rights given to the easement holder were "circumscribed" and the exclusivity was "intended solely to protect these restricted rights"]; see also Rest.3d Property, Servitudes, *supra,*

§ 1.2, com. d, p. 15 ["Easements and profits may authorize the exclusive use of portions of the servient estate, and may involve uses that make any actual use of the premises by the transferor unlikely, but they are still considered nonpossessory interests if the transferor is not excluded from the entire parcel and retains the right to make uses that would not interfere with the easement or profit."].)

The Romeros also argue that our conclusion "contravenes the fundamental maxim of jurisprudence that equity must follow the law." They argue that the Legislature has created an exclusive path to obtaining title to property through adverse possession, in Code of Civil Procedure section 325, and we may not circumvent those requirements by recognizing an alternative means of accomplishing the same end. (See *Marsh v. Edelstein* (1970) 9 Cal.App.3d 132, 140–141.) But the Shih-Kos are not seeking to obtain title to property through adverse possession. As we have explained, section 1104, which codifies the doctrine of implied easements, addresses a wholly different set of circumstances than the adverse possession statute. In holding that exclusive implied easements are not impermissible as a matter of law, we do not "lend [our] aid to accomplish by indirection what the law or its clearly defined policy forbids to be done directly." (*Marsh*, at p. 141.) Instead, we interpret and apply section 1104 "in the light of the common law rules governing easements by implication." (*Fristoe*, *supra*, 35 Cal.2d at p. 9.)

Finally, in their answering brief, the Romeros argue that the trial court's judgment recognizing an exclusive implied easement violates the Due Process and Takings Clauses of the Fifth Amendment. The Romeros did not raise this issue below and therefore have forfeited the objection. (Cal. Rules of Court,

rule 8.500(c)(1); see, e.g., *Lewis v. Superior Court* (2017) 3 Cal.5th 561, 578.) But the argument is without merit in any event. The trial court's implied easement finding did not result in the *creation* of any new property rights; it instead clarified the respective rights of the neighbors as determined by the intentions of the parties at the time the two adjacent parcels were severed and sold to third parties. (See § 1104 [providing that the implied easement passes at the time of the transfer that divides the grantor's estate].) In other words, the trial court's finding means the Romeros purchased the 651 Property subject to the implied easement; their bundle of property rights never included the right to make practical use of the easement's surface area. This is not a taking. (*Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection* (2010) 560 U.S. 702, 715 (plur. opn. of Scalia, J.); *id.* at p. 727 ["And insofar as courts merely clarify and elaborate property entitlements that were previously unclear, they cannot be said to have taken an established property right."].)

Our conclusion does not end the proceedings in this case. As noted, the Romeros contend that even if the law permits exclusive easements by implication, substantial evidence does not support the trial court's conclusion that an implied easement exists in this case. Based on its conclusions on the exclusivity issue, the Court of Appeal declined to evaluate the evidentiary support for the trial court's finding. We now remand for the Court of Appeal to consider the question.

To the extent the Romeros challenge the evidentiary showing of intent to create an easement across their property, the issue for the court to consider is whether the evidence shows that the parties clearly intended for the preexisting use of the quasi-servient tenement to continue after the separation of title.

Remarking on this issue, the Court of Appeal suggested, without formally deciding, that this question may be answered by evidence indicating that "the original grantor Edwin Cutler's intent was . . . to effectuate a variance/lot line adjustment between the 643 and 651 properties." (*Romero, supra*, 78 Cal.App.5th at p. 354.) We note, however, that considered in the abstract, evidence that a party intended to effectuate a variance does not eliminate the possibility that the parties also intended for the preexisting use of the quasi-servient tenement to continue after the separation of title. We express no view on the issue as it arises in this case, nor do we express any view on the weight or significance to be given to the evidence of the uncompleted lot line adjustment among the other relevant facts presented here. The matter is for the Court of Appeal to resolve in the first instance.

## III.

We reverse the judgment of the Court of Appeal as to the cause of action for the implied easement and remand for further proceedings consistent with this opinion.


**KRUGER, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Romero v. Shih

---

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 78 Cal.App.5th 326
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S275023
**Date Filed:** February 1, 2024

---

**Court:** Superior
**County:** Los Angeles
**Judge:** Curtis A. Kin

---

**Counsel:**

McCormick, Barstow, Sheppard, Wayte & Carruth and Scott M. Reddie for Plaintiffs, Cross-defendants and Appellants.

Songstad Randall Coffee & Humphrey, Janet E. Humphrey and Elyn C. Holt for Defendants, Cross-complainants and Respondents.

No appearance for Cross-defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Scott M. Reddie
McCormick, Barstow, Sheppard, Wayte & Carruth LLP
7647 North Fresno Street
Fresno, CA 93720
(559) 433-2156

Janet E. Humphrey
Songstad Randall Coffee & Humphrey LLP
3200 Park Center Drive, Suite 950
Costa Mesa, CA 92626
(949) 757-1600